UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NATHAN L. ADAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:18-cv-03470-SEB-MJD |
| ) | |
| BRIAN MARTZ, et al. ) | |
| ) | |
| Defendants. ) | |

**Order Granting in Part and Denying in Part Defendants' Motions for Summary Judgment, and Denying Plaintiff's Motion for Summary Judgment**

Plaintiff Nathan Adams, an inmate of the Indiana Department of Correction ("IDOC"), filed this 42 U.S.C. § 1983 action against Dr. Roger Perry, Corizon, LLC, and Wexford of Indiana, LLC ("the Medical Defendants") and Brian Martz and Misty Stamper ("the State Defendants") alleging that the defendants retaliated against him for filing grievances in violation of the First Amendment. Specifically, Mr. Adams alleges that Dr. Perry conspired with IDOC officials to dismiss him from his job as a Suicide Watch Companion after he filed grievances regarding a lack of mental health care. He also contends that the municipal Defendants Corizon and Wexford instituted a policy and practice of conspiring to subject offenders like him to retaliation for filing grievances. Mr. Adams further contends that Sergeant Martz retaliated against him by filing a false conduct report, that Officer Stamper retaliated against him in the course of the disciplinary proceeding against him, and that both State Defendants violated his Equal Protection rights by treating white inmates differently than him.

The defendants have moved for summary judgment and Mr. Adams has responded. For the following reasons the Defendants' motions for summary judgment are granted in part and denied in part, and Mr. Adams's motion for summary judgment is denied.

## I. Facts

A. *The Parties*

During all times relevant to his Complaint, Mr. Adams was an inmate incarcerated at the Pendleton Correctional Facility ("Pendleton"). Dkt. 46, ¶ 4; Dkt. 91-1, p. 1 (Deposition of Nathan Adams ("Adams Dep.") at p. 7:20-8:23).

Sergeant Martz is an IDOC correctional officer.

Ms. Stamper is an IDOC disciplinary hearing officer.

Defendant Corizon Health, Inc. ("Corizon") was the company that contracted with the Indiana Department of Correction ("IDOC") to provide medical care to Indiana prisoners though March 31, 2017. Dkt. 46, ¶ 5. Corizon ceased to provide medical services to the IDOC at that time and Wexford of Indiana, LLC ("Wexford") became the new medical service provider for Indiana prisoners. *Id.*, ¶ 6. Wexford has remained the medial service provider for IDOC since April 1, 2017.

Defendant Roger Perry, Ph.D. was a psychiatrist providing mental health care to offenders at Pendleton through June 8, 2018. Dkt. 46, ¶ 7; Dkt. 138-1, ¶ 4.[1]

B. *Mr. Adams's Employment as a Suicide Watch Companion*

  1. Suicide Watch Companion Program Policies

A Suicide Watch Companion is an offender who has satisfactorily completed specialized training to assist staff in the continuous visual monitoring of an offender who has been placed on a formal Suicide Watch status. Dkt. 103-2. To become Suicide Watch Companions, offenders start as volunteers and then transition to becoming official Suicide Watch Companions. Dkt. 91-1, p. 4,

---

[1] The Court notes that the Medical Defendants initially submitted the wrong affidavit of Dr. Perry. But they were directed to file a correct affidavit and they have done so.

6. (Adams Dep., p. 42:3-44:5; 49:9-16). IDOC Directive # 117 provides that to qualify as a Suicide Watch Companion, offenders must, among other requirements, maintain a clear conduct record without any violations for at least one year. Dkt. 103-2, p. 1. The directive further instructs that the offender companion will not work longer than a four-hour shift in any twenty-four-hour period. *Id*., p. 3. Finally, the directive provides that an offender refusing to report for an assigned shift, failing to adhere to the guidelines and expectations, and/or engaging in behavior which jeopardizes the safety of an offender may be subject to receipt of a report of conduct and removal from the Suicide Watch Companion program. *Id*., p. 35.

Suicide Watch Companions would work four-hour shifts and observe other offenders on suicide watch. Dkt. 91-1, p. 4 (Adams Dep. 43:12-44:25). But Mr. Adams acknowledged that in certain circumstances Suicide Companions would work shifts within the same day based on need. *Id*. While he was a Suicide Companion, Mr. Adams testified that there were several occasions where he worked more than one shift in a 24-hour period. *Id.* (Adams Dep. at 43:8-25; 44:1-5).

2. <u>Mr. Adams's Time as a Suicide Watch Companion</u>

Mr. Adams began volunteering as a Suicide Watch Companion in April 2015. Dkt. 100, ¶ 1. On about November 12, 2015, Mr. Adams became a paid Suicide Watch Companion. Dkt. 91-1, pp. 2-3, 5-6 (Adams Dep. 20:17-21:22, 48:25-49:8).

On December 5, 2016, February 15, 2017, and March 1, 2017, Mr. Adams filed grievances regarding his contention that he had not been given psychiatric treatment for conditions he experienced as a Suicide Watch Companion. Dkt. 100, ¶ 3. He requested that Suicide Companions meet with a psychologist after every shift or that a professional mental health counselor be

3

appointed just to see Suicide Companions. Dkt. 138-1, ¶ 6; Dkt. 91-3, p. 2.[2] Dr. Perry responded stating that there was a system for Mr. Adams to meet with a mental health professional, which was filling out a health care request. *Id*.

### 3. Mr. Adams's Conduct Report and Dismissal as a Suicide Watch Companion

On March 7, 2017, Mr. Adams worked as a Suicide Watch Companion from 7:00-11:00A.M. Dkt. 103-6. On March 8, 2017, Mr. Adams and fellow inmate Mr. Windom were summoned to work another shift as a Suicide Watch Companion. Dkt. 46, ¶ 12; dkt. 103-8; dkt. 103-9. The defendants assert that there was an emergency need for companions that day because inmates in the J Cell House could not leave because of a modified lockdown for medical precautions. Dkt. 103-5. Mr. Adams contends, however, that other Suicide Watch Companions in his dorm were available to work that day but were not called to work. Dkt. 115, ¶ 14, 16. When he arrived at work, Mr. Adams testified that he told Sergeant Martz that it was not his time to work and that someone else should work the shift because he had worked within the prior 24-hour period. Dkt. 91-1, p. 7-8 (Adams Dep. at 55:17-57:25). Mr. Windom refused to work for the same reason. Dkt. 103-9. On March 9, 2017, Sergeant Martz submitted a conduct report for Mr. Windom, stating that he committed a Code #356 violation by refusing to work as a Suicide Watch Companion on March 8, 2017. *Id.*

---

[2] When the State Defendants designated evidence in support of their motion for summary judgment, they failed to authenticate that evidence as required by Rule 901 of the Federal Rules of Evidence and they were directed, consistent with Rule 56(e)(3) of the *Federal Rules of Civil Procedure* to do so. Dkt. 131, p. 4. They did so through the affidavit of Michelle Rains. Dkt. 132. Mr. Adams moves to strike Ms. Rains's affidavit because she was not identified as a witness in discovery. The motion to strike, dkt. [132], is **denied** because Ms. Rains's testimony was used only to authenticate evidence that the Court previously found caused Mr. Adams no surprise or undue prejudice. *See* dkt. 131. Likewise, her affidavit is not unduly surprising or prejudicial to Mr. Adams.

Sergeant Martz also wrote a conduct report against Mr. Adams for refusing to work. Dkt. 103-8. In the conduct report, Sergeant Martz wrote that Mr. Adams told him that he had worked the day before and did not feel he should work two days in a row. *Id*. At his deposition, Mr. Adams testified that on the morning of incident he went into work, but it was not his shift. Dkt. 91-1, p. 7-8; (Adams Dep. 55:17-57:25). Mr. Adams testified:

> Dr. Perry, supposed to instruct – instructed all the companions to talk with the officer if they called you earlier, within that 24-hour period, that you're not supposed to work, check our logbook. We did that with the officer on duty. That officer on duty said he didn't care, work anyway. We told him, hey, contact Dr. Perry because we're not supposed to work.
>
> The other two guys were ready to work. He said go in. We went in to work. Once we went into the dorm – when I say "we," it was me and another inmate or prisoner. We went into the dorm.

*Id*., p. 8 (Adams Dep. 57:11-23).

In response to the defendants' motion for summary judgment, Mr. Adams testifies that Sergeant Martz told him, "you work or you're fired, as a matter of fact you're fired so go in." Dkt. 101 ¶ 16. Mr. Adams also contends that Sergeant Martz wrote a bad work evaluation for Mr. Adams even though Mr. Adams had previously received an excellent work evaluation. *Id.* ¶ 20, 23. A week later Mr. Adams received a conduct report stating that he refused to work. Dkt. 91-1, p. 8 (Adams Dep. 57:23-25).

On March 15, 2017, Disciplinary Hearing Board Officer Sarah Napper emailed Dr. Perry and informed him that two suicide companions, one of which was Mr. Adams, received conduct reports for refusing an assignment. Dkt. 138-1, ¶ 8; dkt. 91-3, p. 4. Ms. Napper reported that both offenders stated that they had worked the day before and felt that they should not work that day. *Id*. While Mr. Adams denies requesting a statement from Dr. Perry, Ms. Napper stated in her email

5

that the offenders requested a statement from Dr. Perry as part of their disciplinary hearing proceedings. *Id*. Dr. Perry responded as follows:

> Typically there are procedures for the rotations of workers as Suicide Companions. However, they are informed that as part of the job, since they are paid whether or not they actually work a shift, they will be available whenever they are needed. Apparently, the two in question were not willing to work successive shifts (despite not having worked for several days and were paid for those days) when there was the unusual emergency need for companions since those in J Cell House could not leave because of the modified lock [d]own for medical precautions. It was my understanding that the Sgt making the assignments gave them the option of working or returning to their unit and refusing to work. It appears they chose the option of returning to their unit, refusing to work and the ensuing consequences. It is true that under normal circumstances, they would not need to work successive shifts but it is our position that any order given by staff should be followed and the issue resolved later to determine if that was incorrect.
>
> I will be seeing Mr. Adams to respond to his request for interview. I will read him a copy of this e-mail. I will allow him to reapply (if he remains interested) in 90 days.
>
> Windom was NOT assigned as a suicide companion. He was volunteering and had no actual job. I still feel he should have following the directive of the Seg. But I am not sure how he can be held accountable for not fulfilling a work assignment that he did not officially have. He too has [been] removed from the volunteer list and will be allowed to resubmit an application after 90 days.

Dkt. 91-3, p. 4.

On March 18, 2017, Dr. Perry met with Mr. Adams to discuss the incident and noted that he had been relieved as a Suicide Watch Companion for approximately three weeks. Dkt. 138-1, ¶ 9; dkt. 91-3, p. 5. Dr. Perry charted:

> Individual seen in response to a "request for interview." He [had] been relieved of his position as a Suicide Companion about three weeks ago and was still very upset about it. He dwelled on the legal issues surrounding the "firing" and the possibility of reporting staff having enhance the story significantly. He had a completely different version of the situation and this version was echoed by some staff. It was pointed out to him that I was not particularly concerned about the legal issues as I was about the possible negative cloud on the program. He was reminded that he can reapply 90 days from the date of his being relieved from duty. Will research the difference between "firing" and suspension and determine if we can (after the fact) list his release as a 90-day suspension.

6

>Dkt. 91-3, p. 5.

On March 24, 2017, IDOC staff updated Mr. Adams's Conduct Summary report to show a class 356 infraction for refusing an order. *Id.*, p. 6. On April 4, 2017, the IDOC classification officer documented that Mr. Adams was dismissed from his job a Suicide Watch Companion for a class 356 infraction – refusing an assignment. *Id.*, p. 7. Dr. Perry did not make the determination to dismiss Mr. Adams and did not have the authority to dismiss Suicide Watch Companions as a psychologist. Dkt. 138-1, ¶ 10.

At the disciplinary hearing, Mr. Adams requested Ms. Stamper to call Sergeant Martz, Officer Wilson, Offender Windom, Offender Warner, and Offender Davis as witnesses. Dkt. 100 ¶ 15. Officer Stamper denied this request. Dkt. 100 ¶ 20. Mr. Adams testifies that Officer Stamper told him: "Dr. Perry and Sergeant Martz want to see you found guilty to get you out of work so that's what I'm gonna do." Dkt. 101 ¶ 49. Ms. Stamper found Mr. Adams guilty of refusing an assignment. Dkt. 100 ¶ 24.

On April 11, 2017, Mr. Adams filed a Disciplinary Hearing Appeal stating that he did not refuse to work. Dkt. 91-3, p. 8. Mr. Adams stated that he had worked the day before and IDOC policy stated that a suicide companion should not work another shift in a 24-hour period. *Id*. He stated that he told Sergeant Martz that he called out the wrong person because he had worked the day prior and that Offender Warner was next on the rotation list. *Id*. He went on to state that Sergeant Martz eventually called out Offender Warner to work the shift, which proved that he was available and next on the rotation. *Id*. IDOC staff responded that the sanctions imposed were within the guidelines of the policy and denied the appeal. *Id*.

### III. Discussion

The parties seek summary judgment on Mr. Adams's retaliation and equal protection claims.

A. *Retaliation*

To prevail on a First Amendment retaliation claim, Mr. Adams must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

1. *Protected Activity*

Here, the defendants do not dispute that Mr. Adams has satisfied the first element of his retaliation claim. His grievances about the Suicide Watch Companion Program were protected by the First Amendment. *See Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) ("filing a non-frivolous grievance is a constitutionally protected activity sufficient to support a retaliation claim").

2. *Deprivation Likely to Deter First Amendment Activity*

The defendants also do not argue that Mr. Adams did not suffer a deprivation that is likely to deter First Amendment activity. Mr. Adams lost his prison job, which is likely to deter First Amendment activity.

3. *Motivating Factor*

The defendants argue that any protected activity on Mr. Adams's part was not a motivating factor in any action taken against him.

To prove his First Amendment retaliation claim, Mr. Adams must show that his protected activity was the cause of the retaliatory action. He can do so by showing that the "protected activity was 'at least a motivating factor' for the retaliatory action." *Thomas v. Anderson*, 912 F.3d 971, 976 (7th Cir. 2018) (quoting *Perez*, 732 F.3d at 783). Mr. Adams argues that he was disciplined and fired from the Suicide Watch Companion Program because he filed grievances complaining about that program. This is enough to show that his grievances were at least a motivating factor in the action taken against him.

Because Mr. Adams can establish a prima facie case of retaliation, "[t]he burden then shifts to the defendants to show that they would have taken the action despite the bad motive." *Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013) (citation omitted). If the defendants meet their burden of establishing a non-retaliatory motive for the allegedly retaliatory action, the plaintiff "then must persuade a fact-finder that the defendants' proffered reasons were pretextual and that retaliatory animus was the real reason" for the retaliatory action. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). This means that Mr. Adams "must produce evidence upon which a rational finder of fact would infer that [the defendants'] explanations were lies." *Id.* "[T]he ultimate question is whether events would have transpired differently absent the retaliatory motive." *Babcock*, 102 F.3d at 275. The Court will assess each defendants' motive separately.

### Brian Martz

Sergeant Martz argues Mr. Adams cannot prevail on his retaliation claim against him because he had a legitimate, non-retaliatory reason for filing the conduct report as Mr. Adams refused to work in violation of IDOC policy. Mr. Adams argues that, under the policy, he should not have been called into work that day because he had already worked a shift in the last 24 hours.

9

Here, there is a genuine issue of material fact regarding whether Sergeant Martz retaliated against Mr. Adams. While Sergeant Martz contends that he appropriately filed a conduct report against Mr. Adams for refusing a shift, Mr. Adams has presented evidence that he did not refuse to work, but only explained that he should not have been called to work because he had already worked in the last 24 hours and asked Sergeant Martz to check the log book. Further, while the defendants contend that, because of a lockdown, no other inmates were available to work, Mr. Adams testifies that he was aware of two other inmates in his dorm that were dressed and ready to work at the time he was called to work. Further, Mr. Adams testifies that Ms. Stamper told him that Sergeant Adams and Dr. Perry wanted him to be fired from the Suicide Watch Program. Dkt. 101 ¶ 49. Viewing this evidence in the light most favorable to Mr. Adams, a reasonable jury might conclude that Sergeant Martz called Mr. Adams into work in violation of IDOC policy so that Mr. Adams might be charged with refusal of an assignment and removed from the Suicide Watch Companion program. On the other hand, considering this evidence in the light most favorable to the defendants, a reasonable jury might believe that Sergeant Martz was justified in writing Mr. Adams a conduct report for refusing an assignment. Neither Sergeant Martz nor Mr. Adams is entitled to summary judgment on this claim.

<u>Misty Stamper</u>

Next, Ms. Stamper argues that she did not retaliate against Mr. Adams because she gave him a full and fair disciplinary hearing.

At the disciplinary hearing, Mr. Adams requested Ms. Stamper to call Sergeant Martz, Officer Wilson, Offender Windom, Offender Warner, and Offender Davis as witnesses. Dkt. 100 ¶ 15. Officer Stamper denied this request. Dkt. 100 ¶ 20. Mr. Adams also testifies that Officer

Stamper told him: "Dr. Perry and Sergeant Martz want to see you found guilty to get you out of work so that's what I'm gonna do." Dkt. 101 ¶ 49.

Mr. Adams was found guilty of refusing an assignment. Dkt. 100 ¶ 24. "Inmates have a due process right to call witnesses at their disciplinary hearings when doing so would be consistent with institutional safety and correctional goals." *Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (citing *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974)). However, "prisoners do not have the right to call witnesses whose testimony would be irrelevant, repetitive, or unnecessary." *Pannell v. McBride*, 306 F.3d 499, 503 (7th Cir. 2002). Ms. Stamper contends that, as the hearing officer, she was entitled to deny the request to call witnesses if doing so would "result in the admission of irrelevant or repetitive testimony." Ind. Code §11-11-5-5(a)(5). But there is no evidence to support a conclusion that the testimony of the proposed witnesses would have been irrelevant or repetitive. Mr. Adams contends that Offenders Warner and Davis were prepared to report for duty as Suicide Watch Companions when he was called to report. Their testimony might have been relevant to whether he had refused an assignment.

Viewing the evidence in the light most favorable to Mr. Adams, a reasonable jury might conclude that Ms. Stamper conducted an incomplete disciplinary hearing and therefore that her proposed non-retaliatory reason for finding him guilty is pretextual. Similarly, considering this evidence in the light most favorable to the Ms. Stamper, a reasonable jury might believe that Mr. Adams did refuse to work, and she was justified in finding Mr. Adams guilty of refusing a job assignment. Neither Ms. Stamper nor Mr. Adams is entitled to summary judgment.

### Roger Perry

Dr. Perry argues that he did not personally participate in the alleged retaliation against Mr. Adams. He asserts that IDOC staff, not medical staff, had the authority to hire and dismiss

Suicide Watch Companions. Mr. Adams's conduct report, disciplinary hearing, and reclassification were all handled by prison staff. Dr. Perry's involvement included providing a statement to the disciplinary hearing officer regarding his interactions with Mr. Adams[3] and responding to his grievances.

Here, there is a dispute of fact regarding whether Dr. Perry retaliated against Mr. Adams. A reasonable jury might believe that Dr. Perry merely responded to Ms. Napper's questions about Mr. Adams's work assignment. On the other hand, if a reasonable jury believed that Dr. Perry told Ms. Stamper he wanted Mr. Adams fired, that jury might conclude that Dr. Perry's asserted motives were pretext. Neither Mr. Adams nor Dr. Perry is entitled to summary judgment on this claim.

B. *Equal Protection Claims*

Mr. Adams also asserts that the State Defendants violated his equal protection rights under the Fourteenth Amendment because he was treated differently than inmate Windom. To succeed on this claim, Mr. Adams must show that he was "intentionally treated differently from others similarly situated." *Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 1002 (7th Cir. 2006); *McDonald v. Vill. of Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004). To be considered "similarly situated," Mr. Adams and his comparator must be "*prima facie* identical in all relevant respects or directly comparable ... in all material respects." *Racine Charter One, Inc. v. Racine Unified Sch. Dist.,* 424 F.3d 677, 680 (7th Cir. 2005); *Purze v. Vill. of Winthrop Harbor,* 286 F.3d 452, 455 (7th Cir. 2002).

Here, it is undisputed that Mr. Adams was a paid Suicide Watch Companion, while Mr. Windom was an unpaid volunteer. Because Mr. Adams and Mr. Windom were not identical in all respects, Mr. Adams has failed to show that Mr. Windom was similarly situated to him. The

---

[3] Mr. Adams disputes that he requested a statement from Dr. Perry, but this dispute is not material.

12

State Defendants are therefore entitled to summary judgment on Mr. Adams's equal protection claim.

    C. *Claims Against Corizon and Wexford*

Finally, the parties seek summary judgment on Mr. Adams's claim against defendants Corizon and Wexford. Because Corizon and Wexford act under color of state law by contracting to perform a government function, i.e., providing medical care to correctional facilities, they are treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). Thus, to survive summary judgment, Mr. Adams must produce evidence of "the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chi.*, 690 F.3d 829, 833-34 (7th Cir. 2012) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989)); *see also Monell*, 436 U.S. at 694.

Mr. Adams's policy and practice claims are based on his experience in receiving a conduct report and being dismissed from the Suicide Watch Companion Program. He has not presented any evidence of any similar experience of other inmates. He also has not provided any evidence of any express policy of retaliation on the part of Corizon or Wexford. Corizon and Wexford are therefore entitled to summary judgment on Mr. Adams's claims against them.

### IV. Conclusion

For the foregoing reasons, Mr. Adams's motion for summary judgment, dkt. [99], is **denied**, the State Defendants' motion for summary judgment, dkt. [102], is **granted in part and denied in part**, and the Medical Defendants' motion for summary judgment, dkt. [89], is **granted in part and denied in part**. The **clerk shall terminate** Corizon and Wexford as defendants. No partial final judgment shall issue as to the claims dismissed in this order.

Mr. Adams's motion to strike, dkt. [133], is **denied**.

**IT IS SO ORDERED.**

Date: _____1/19/2021_____                                        _____*Sarah Evans Barker*_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

NATHAN L. ADAMS
112090
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel